## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| JESSICA GETZ, Derivatively on Behalf of Nominal Defendant THE LOVESAC COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> SHAWN NELSON, ANDREW R. HEYER, JACK KRAUSE, JOHN GRAFER, SHARON M. LEITE,  VINEET MEHRA, WALTER F. MCLALLEN, SHIRLEY ROMIG, and DONNA DELLOMO, <br><br> Defendants, <br><br> and <br><br> THE LOVESAC COMPANY, <br><br> Nominal Defendant. | Case No. _____ |

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Jessica Getz ("Plaintiff"), by and through her undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant The Lovesac Company (herein referred to as "Lovesac" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law.  Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Company's publicly available documents, including the allegations of the amended class action complaint filed in the securities class action captioned *Gutknecht v. The Lovesac Company, et al.,* Case No. 3:23-cv-01640-KAD

(D. Conn.) (the "Securities Class Action"), conference call transcripts and announcements, filings with the United States Securities and Exchange Commission (the "SEC"), press releases published by and regarding Lovesac, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of Lovesac against certain officers and members of the Company's Board for breaches of their fiduciary duties between at least June 8, 2022, and August 16, 2023, inclusive (the "Relevant Period") and violation of the federal securities laws by causing the issuance of materially false and misleading statements in the Company's SEC filings and in other public statements that have exposed the Company to massive class-wide liability, as well as the expenditure substantial defense costs in connection with the Securities Class Action, as set forth below.

2.      Lovesac is a furniture company specializing in modular sectional couches and other comfortable seating. The Company is best known for its flagship product, a beanbag chair called the Sac.

3.      Lovesac promotes itself as a company capable of quick delivery relative to traditional furniture retailers.

4.      On August 16, 2023, Lovesac filed a current report on Form 8-K, which disclosed that investors should no longer rely on financial statements that the Company had previously included in its public disclosures.

5.       Lovesac further disclosed that the Audit Committee of the Board had launched an investigation into the Company's internal controls after discovering that the Company had failed to properly account for last mile freight expenses, causing some of Lovesac's previously disclosed financial figures to be misstated.

6.      On this news, the price of Lovesac stock declined 2.95%, closing at $23.06 per share on August 17, 2023.

7.      On November 2, 2023, the Company filed a Form 10-K/A, restating its financial results for the fiscal year ended January 29, 2023 and a Form 10-Q/A, restating its financial results for the fiscal quarter ended April 30, 2023 (collectively, the "Restatement").

8.      The Restatement revealed further issues with the Company's accounting practices including, *inter alia*, the Company's misclassification of cash flows and its failure to properly account for revenue, inventory, and supplier rebates.

9.      The Restatement further disclosed material deficiencies in the Company's internal controls over financial reporting resulting from a "lack of a sufficient number of professionals with an appropriate level of accounting knowledge, training and experience." The Restatement additionally attributed Lovesac's inadequate internal controls to high turnover in the Company's accounting department.

10.     Indeed, former Lovesac employees confirm that the Company's accounting department was plagued by high turnover, inefficiencies, and a lack of employee engagement and competency.

11.     As a result of the foregoing, the Securities Class Action was filed against the Company and certain of its executive officers on December 19, 2023, alleging violations of the federal securities laws.

12.     As a direct and proximate result of the misconduct detailed herein, the Company has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill.

13.     Plaintiff did not make a demand on the Board because, as further detailed herein,

demand would be a futile and useless act.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section

27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein

for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and Rule 14a-9 (17

C.F.R.§240.14a-9) promulgated thereunder by the SEC.

15.     Plaintiff's claims also raise a federal question pertaining to the claims made in the

Securities Class Action based on violations of the Securities Act.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant

to 28 U.S.C. § 1367(a).

17.     This action is not a collusive action designed to confer jurisdiction on a court of the

United States that it would not otherwise have.

18.     In connection with the acts, conduct and other wrongs complained of herein, the

Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate

commerce, the United States mail, and the facilities of a national securities market.

19.     Venue is proper in this District pursuant to Section 27(a) of the Securities Exchange

Act and 28 U.S.C. §1391(b)(1), as Lovesac maintains its principal executive offices in this District

and a substantial portion of the acts and omissions alleged herein, including the dissemination of

materially false and misleading information, occurred in this District.

## PARTIES

### Plaintiff

20.     Plaintiff is, and has been at all relevant times, a shareholder of Lovesac.

### Nominal Defendant

21. Nominal Defendant Lovesac is incorporated under the laws of the State of Delaware.

22. The Company's principal executive offices are located at Two Landmark Square, Suite 300, Stamford, Connecticut 06901. Lovesac's common stock trades on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "LOVE."

***Individual Defendants***

23. Defendant Shawn Nelson ("Nelson") founded Lovesac in 1998 and has served as the Company's Chief Executive Officer ("CEO") and as a member of the Board at all relevant times. According to the Company's public filings, Defendant Nelson received $9,092,935 during the fiscal year ended February 4, 2024 in compensation from the Company. As of April 15, 2024, Defendant Nelson beneficially owned 575,462 shares of Lovesac common stock, worth $10,818,685[1] and constituting 3.64% of the Company's total outstanding shares. Defendant Nelson is named as a defendant in the Securities Class Action.

24. Defendant Andrew R. Heyer ("Heyer") has served as Chairman of the Board at all relevant times. According to the Company's public filings, Defendant Heyer received $217,500 during the fiscal year ended February 4, 2024 in compensation from the Company. As of April 15, 2024, Defendant Heyer beneficially owned 323,536 shares of Lovesac common stock, worth $6,082,476 and constituting 2.09% of the Company's total outstanding shares.

25. Defendant Jack Krause ("Krause") has served as a member of the Board at all relevant times. Defendant Krause additionally served as the Company's Chief Strategy Officer between November 2021 and June 2023. Prior to that, Defendant Krause served as the Company's President and Chief Operating Officer ("COO") from 2015 until November 2021. According to

---

[1] Valuations of the Individual Defendants' holdings of Company stock are based on the $18.80 per share closing price of Lovesac's stock on April 15, 2024.

the Company's public filings, Defendant Krause received $1,520,144 during the fiscal year ended February 4, 2024 in compensation from the Company. As of April 15, 2024, Defendant Kraus beneficially owned 313,170 shares of Lovesac common stock, worth $5,887,596 and constituting 2.01% of the Company's total outstanding shares.

26.     Defendant John Grafer ("Grafer") has served as a member of the Board at all relevant times. According to the Company's public filings, Defendant Grafer received $187,500 during the fiscal year ended February 4, 2024 in compensation from the Company. As of April 15, 2024, Defendant Grafer beneficially owned 625,890 shares of Lovesac common stock, worth $11,766,732 and constituting 4.04% of the Company's total outstanding shares.

27.     Defendant Sharon M. Leite ("Leite") has served as a member of the Board and as a member of the Audit Committee at all relevant times. According to the Company's public filings, Defendant Leite received $187,500 during the fiscal year ended February 4, 2024 in compensation from the Company. As of April 15, 2024, Defendant Leite beneficially owned 16,158 shares of Lovesac common stock, worth $303,770.

28.     Defendant Vineet Mehra ("Mehra") has served as a member of the Board since July 2022 and has served as a member of the Audit Committee since March 2023. According to the Company's public filings, Defendant Mehra received $187,500 during the fiscal year ended February 4, 2024 in compensation from the Company. As of April 15, 2024, Defendant Mehra beneficially owned 10,936 shares of Lovesac common stock, worth $205,596.

29.     Defendant Walter F. McLallen ("McLallen") has served as a member of the Board and as Chair of the Audit Committee at all relevant times. According to the Company's public filings, Defendant McLallen received $211,250 during the fiscal year ended February 4, 2024 in compensation from the Company. As of April 15, 2024, Defendant McLallen beneficially owned 19,540 shares of Lovesac common stock, worth $367,352.

30.     Defendant Shirley Romig ("Romig") has served as a member of the Board at all relevant times and served as a member of the Audit Committee from 2020 until March 2023. According to the Company's public filings, Defendant Romig received $197,500 during the fiscal year ended February 4, 2024 in compensation from the Company. As of April 15, 2024, Defendant Romig beneficially owned 14,265 shares of Lovesac common stock, worth $268,182.

**Officer Defendant**

31.     Defendant Donna Dellomo ("Dellomo") served as Executive Vice President, Chief Financial Officer ("CFO"), Treasurer, and Secretary of the Company from 2017 until June 30, 2023. According to the Company's public filings, Defendant Dellomo received $1,533,472 during the fiscal year ended February 4, 2024 in compensation from the Company.

**Non-Party Confidential Witnesses**

32.     This action is based on Plaintiff's review, by counsel, of an extensive record of public documents as well as the Amended Class Action Complaint (the "Amended Complaint") in the Securities Class Action ("Securities Class Action Complaint") which contains detailed allegations based on interviews with nine former Lovesac employees (referred to herein as FEs 1-5) who provided information to plaintiffs' counsel in the Securities Action supporting the allegations in that case. These former employees provided information on a confidential basis and were described in the Amended Complaint with sufficient detail to establish their reliability and personal knowledge.

33.     FE 1 worked as a project manager at Lovesac from November 2019 until 2024, working on product development. FE 1 reported first to Dave Underwood, Vice President of Product Development, then to Curtis Strong, Director of Product Development, and then to Kylie William, Director of Commercialization.

34.     FE 2 worked as a senior accountant at Lovesac from June 2019 until June 2023. FE

2 reported to various Lovesac employees at different times, including Defendant Dellomo.

35.     FE 3 worked as brand activation specialist at Lovesac from May 2021 until January 2023. FE 3's role consisted of, among other things, sending invoices from vendors to the accounts payable department.

36.     FE 4 worked at Lovesac from 2010 until July 2023. FE 4 began working in a Company showroom and held a variety of roles at the Company before becoming director of customer channel marketing in July 2020. In that role, FE 4 reported to Patrick Santangelo, senior vice president of brand, and Charlie Tubb, vice president of customer channel marketing.

37.     FE 5 worked as a District Manager at Lovesac from May 2022 until August 2023. FE 5 managed 16 stores in northern California and Nevada and reported to Regional Manager David Moss.

## FIDUCIARY DUTIES OF THE DIRECTOR DEFENDANTS

38.     By reason of their positions as officers and/or directors of Lovesac, and because of their ability to control the business and corporate affairs of Lovesac, the Individual Defendants owed Lovesac and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Lovesac in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Lovesac and its shareholders.

39.     Each director and officer of the Company owes to Lovesac and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

40.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Lovesac, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

41.     To discharge their duties, the officers and directors of Lovesac were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

42.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Lovesac, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

43.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

44.     To discharge their duties, the officers and directors of Lovesac were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal

controls of the Company.  By virtue of such duties, the officers and directors of Lovesac were required to, among other things:

        (a)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Lovesac's own Code of Business Conduct and Ethics;

        (b)     Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

        (c)     Remain informed as to how Lovesac conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

        (d)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of Lovesac and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

        (e)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Lovesac's operations would comply with all applicable laws and Lovesac's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

        (f)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate; and

        (g)     Examine and evaluate any reports of examinations, audits, or other financial

information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

45.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Lovesac.

46.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Lovesac and were at all times acting within the course and scope of such agency.

47.     Each of the Individual Defendants breached his or her fiduciary duties as alleged herein, both individually and in concert with the other Defendants.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

48.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

49.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

50.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

51.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.  Because the actions

described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Lovesac, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

52.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

53.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Lovesac and at all times acted within the course and scope of such agency.

**LOVESAC'S CODE OF BUSINESS CONDUCT AND ETHICS**

54.     The purpose of Lovesac's Corporate Code of Business Conduct and Ethics (the "Code of Conduct") is to:

[D]eter wrongdoing and to promote:

- Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
- Full, fair, accurate, timely and understandable disclosure in reports and documents that Lovesac files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other public communications made by Lovesac;
- Compliance with applicable governmental laws, rules and regulations; and
- The prompt internal reporting to an appropriate person or persons identified in the Code of violations of the Code and accountability for adherence to the Code.

55.     The Code of Conduct applies to "all directors, officers and associates of The

Lovesac Company and its subsidiaries," and violations of the Code of Conduct will result in "disciplinary action, up to and including termination of employment. Violators may also be subject to criminal prosecution or civil lawsuits."

56.     In a section titled "**Compliance with Applicable Laws, Rules and Regulations**," the Code of Conduct states, in pertinent part, that "[o]beying the law is the foundation on which Lovesac's ethical standards are built. You must comply with applicable laws, rules and regulations."

57.     In a section titled "**Compliance at Lovesac**," the Code of Conduct states, in pertinent part:

> Lovesac has established a structured compliance system to support legal and ethical actions throughout the Company. Compliance with this policy will be led by the Chief Financial Officer and the Nominating and Governance Committee, but the responsibility for compliance is shared by all associates. The Chief Financial Officer will be responsible for overseeing the Lovesac compliance system, including maintaining current policies, conducting training, auditing, monitoring, testing, communication, investigations and enforcement.

58.     In a section titled "**Public Disclosure of Information**," the Code of Conduct states, in pertinent part:

> The federal securities laws require Lovesac to disclose certain information in various reports that the Company must file with or submit to the SEC. In addition, from time to time, Lovesac makes other public communications, such as issuing press releases.

> Lovesac expects all directors, officers and associates who are involved in the preparation of SEC reports or other public documents to (a) ensure that the information disclosed in those documents is complete, fair, accurate, timely and understandable and (b) be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting.

59.     In a section titled "**Financial Reporting and Record-Keeping**," the Code of Conduct states:

> Lovesac requires honest and accurate recording and reporting of information in order to make responsible business decisions and to comply with the law.

\* \* \*

All of Lovesac's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect Lovesac's transactions and must conform both to applicable legal requirements and to Lovesac's system of internal controls. Business transactions shall be reported promptly and accurately in order to permit the preparation of accurate financial and other records and shall be executed only by associates authorized to do so. Associates are prohibited from knowingly making untrue or misleading statements to our independent auditors or internal auditors or causing anyone else to do so, and no associate may seek to improperly influence, directly or indirectly, the auditing of our financial records. Data transmitted and/or stored electronically by the Company shall be protected from errors, disasters, misuse, unauthorized access and fraud.

No associate may create or participate in the creation of any records that contain false information or that are intended to mislead anyone or conceal anything that is improper. To ensure that records accurately and fairly represent all business transactions: all assets and transactions must be recorded in normal books and records; no unrecorded funds shall be established or maintained for any purpose; all expense reports must accurately reflect the true nature of the expense; and oral and written descriptions of transactions, whether completed or contemplated, provided to those responsible for the preparation or verification of financial records must be accurate. If an associate becomes aware of any improper accounting or financial reporting practice or any improperly recorded or documented transaction, he or she should report the matter immediately to the Chief Financial Officer or the Chair of the Audit Committee.

60.     In a section titled "**Protection and Proper Use of Lovesac Assets**," the Code of Conduct states, in pertinent part, that directors, officers and associates of the Company "should endeavor to protect Lovesac's assets and endure their efficient use."

## LOVESAC'S AUDIT COMMITTEE CHARTER

61.     Lovesac's Audit Committee Charter states that the purpose of the Audit Committee is to, *inter alia,* oversee "the accounting and financial reporting processes and the systems of internal accounting and financial controls of the Company" and "the audits of the Company's financial statements."

62.     In a subsection titled "*Meetings with Management, the Registered Independent Auditor and the Internal Auditor Concerning the Annual Audit,*" the Audit Committee Charter

states:

(ii)     The Committee shall review and discuss with management and the registered independent auditor: (A) major issues regarding accounting principles and estimates, and financial statement presentation, including any significant changes in the Company's selection or application of accounting principles or estimates, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of significant deficiencies or material weaknesses; (B) any analyses prepared by management or the registered independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including analyses of the effects of alternative GAAP methods on the Company's financial statements; and (C) the effect of regulatory and accounting pronouncements, including off-balance sheet structures and their associated risks, as well as market risks, on the Company's financial statements.

(iii)    The Committee shall (A) review and discuss with management and the registered independent auditor management's assessment regarding the effectiveness of internal controls over financial reporting as of the end of the fiscal year and the independent auditors' report on management's assessment, (B) determine that the disclosures describing any identified material weaknesses or significant deficiencies and management's remediation plans are clear and complete and (C) discuss with management and the registered independent auditors (1) changes in internal control over financial reporting that have materially affected or are reasonably likely to materially affect the Company's internal control over financial reporting that are required to be disclosed and (2) any other changes in internal control over financial reporting that were considered for disclosure.

(iv)    The Committee shall review and discuss the annual audited financial statements with management and the registered independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A").

63.     In a subsection titled "*Meetings with Management and the Registered Independent Auditor Concerning Reviewed Periods,*" the Audit Committee Charter states that the Audit Committee shall "review and discuss the quarterly financial statements with management and the registered independent auditor prior to the filing of the 10-Q, including the results of the independent auditor's review of the quarterly financial statements and the Company's disclosures under the MD&A."

64.     In a subsection titled "*Meetings with Management and the Registered Independent Auditor Concerning Earnings Releases and Other Matters,*" the Audit Committee Charter states that the Audit Committee shall "discuss with management and the registered independent auditor the information to generally be disclosed in the Company's earnings press releases."

65.     In a section titled "*Risk Assessment and Management,*" the Audit Committee Charter states:

> The Committee shall discuss with management the Company's policies with respect to risk assessment and risk management. The Committee shall discuss with management the Company's significant financial risk exposures and the actions management has taken to limit, monitor, control or mitigate such exposures including steps management has taken to protect against threats to the Company's information systems and security.

## SUBSTANTIVE ALLEGATIONS

### Background

66.     Lovesac is a furniture company specializing in modular sectional couches and other comfortable seating. The Company is best known for its flagship product, a beanbag chair called the Sac. Lovesac offers its products online as well as out of pop-up shops in Costco and Best Buy stores and out of its own showroom.

67.     Lovesac promotes itself as a company capable of quick delivery relative to traditional furniture retailers.

### Former Employees Recall Material Deficiencies with the Company's Finance Function

68.     FE 2, a former senior accountant at Lovesac, explained that the Company's finance function consisted of four segments: accounting, financial planning and analysis ("FP&A"), accounts payable, and loss prevention and cash application. FE 2's responsibilities at the Company included managing prepaid accounts, mixed asset accounts, and tangible asset accounts, reviewing accounts payable entries, processing credit card fraud claims and chargebacks, and assembling and

submitting documents for SEC reporting.

69.     FE 2 recalled constant turnover in the Company's finance function. FE 2 initially reported to the accounting manager before reporting directly to the Company's controller. When the controller left the Company, FE 2 began reporting directly to Defendant Dellomo. Then, for a period of time, the FP&A manager assumed the role of the accounting manager above FE 2. Lovesac subsequently hired a new accounting manager and a new controller. Both were replaced, still during FE 2's tenure. FE 2 attributed high turnover in the Company's finance function to high workloads and constantly changing processes and responsibilities.

70.     For instance, FE 2 was responsible for tracking sales from the end of each month. When Lovesac sold products through stores like Costco and Best Buy, those stores would monitor sales of Lovesac products through their own reporting systems, and then, after deducting their commissions, transfer the revenue from the sales to Lovesac at the end of each month. Some months, however, those companies only sent Lovesac revenue from sales that occurred through the 28th day of the month, and sales for the last two or three days would not yet be recognized. FE 2 was responsible for calculating sales information for those last few days, but he relied on another Lovesac employee to provide him with the requisite information to make those calculations. Compromising the efficiency of this process was the fact that the role of providing FE 2 with the needed information was constantly shifting from one employee to another. Defendant Dellomo not only understood this issue but in fact perpetuated it, directing FE 2 to get the needed information from different employees each month. Some months, Defendant Dellomo directed FE 2 to compile the necessary data without consulting anyone else.

71.     FE 2 explained that preparation of Lovesac's financial reports for public disclosure involved close coordination with the Company's auditors at Deloitte before final approval by the Board, CFO Defendant Dellomo, legal counsel, and the auditors.

72.     FE 2 recalled struggling to timely prepare financial statements due to an accounts payable process at the Company that FE 2 described as "absolutely horrific." Invoices were not timely paid, and the accounting department would often input payments into the system weeks after the financial period had closed. Accordingly, by the time the CFO reviewed the financial statements, the statements would have to be updated to reflect changes in the underlying data.

73.     FE 3 confirmed that the accounts payable department was plagued by inaccuracies and delays. FE 3 was responsible for sending invoices from vendors to the accounts payable department and referred to the process as "a hot mess." FE 3 recalled exorbitant delays in payments to vendors and some payments not being fulfilled.

74.     FE 5, a former District Manager at Lovesac, recalled similar issues. FE 5 recalled a conference call attended by the Company's district managers, during which Senior Vice President of Retail, Chad Best ("Best"), explained that the Company had to terminate several employees in the accounts payable department for stealing from Lovesac by transferring Company money into their personal accounts instead of paying the Company's bills. According to FE 5, these employees stole substantial amounts from the Company. Indeed, district managers were directed to increase top line sales by millions of dollars to cover the losses attributed to theft.

75.     FE 5 stated that, prior to this conference call, several stores were experiencing issues related to failure to pay bills. At least three stores in FE 5's district had their power shut off for nonpayment. The highest volume location in FE 5's district lost telephone service for almost a week due to nonpayment. FE 5 further recalled instances in which stores were threatened with eviction for failure to pay rent. According to FE 5, some of these issues persisted even after the conference call.

76.     FE 5 explained that the only way to contact the accounts payable department was to email a general account associated with the department. FE 5 messaged this account to

complaint about issues related to nonpayment of Company bills and only received general acknowledgements that the emails had been received without any explanation as to why payments were delayed or not made.

77.     FE 4, former director of customer channel marketing, recalled having to do the finance department's job because the finance department lacked the ability to perform basic functions. FE 5 discussed the finance department's incompetence with Defendant Dellomo, but nothing was resolved.

78.     FE 4 further corroborated FE 2's account that the finance department often failed to close out the books at the end of each month. FE 4 stated that in or around the spring of 2021, the finance department was forced to write of $350,000 due to a significant delay in reconciling transactions from FE 4's team.

79.     FE 4 recalled annual employee engagement surveys that were distributed by Lovesac to each department to evaluate how invested employees were in their work and whether employees felt that they had adequate support and tools to effectively do their jobs. The surveys would result in an engagement score out of 100 points for each department. FE 4 stated that the finance team had the lowest engagement score several years in a row, with scores in the 20s. Comparatively, the HR team boasted scores in the 90s and FE 4's team scored in the 80s.

80.     With respect to last mile freight expenses, FE 1 stated that there was no Company-wide understanding on what "last mile" even meant, and there was no consistent guidance from Company leadership regarding which expenses should be fall under that category.

***Lovesac Violated GAAP by Failing to Properly Account for Shipping Expenses***

81.     The Financial Accounting Standards Board ("FASB") is recognized as the authority for accounting standards in the United States. FASB has established a codification system, known as the Accounting Standards Codification("ASC") which serves as an authoritative source for

Generally Accepted Accounting Principles ("GAAP").

82.     Accruals allow an entity to record an expense that was incurred in one accounting period but paid in a subsequent period. GAAP requires accruals to provide a more accurate view of an entity's financial position, as compared with cash-basis accounting, in which expenses are recorded when paid.

83.     Pursuant to ASC topic 606, an entity must accrue the costs of shipping and handling activities if the entity accounts for shipping and handling as activities to fulfill the promise to transfer the good and the shipping and handling activities are performed after a customer obtains control of the good:

> An entity that promises a good to a customer also might perform shipping and handling activities related to that good. If the shipping and handling activities are performed before the customer obtains control of the good … , then the shipping and handling activities are not a promised service to the customer. Rather, shipping and handling are activities to fulfill the entity's promise to transfer the good. ASC 606-10-25-18A

> If shipping and handling activities are performed after a customer obtains control of the good, then the entity may elect to account for shipping and handling as activities to fulfill the promise to transfer the good. The entity shall apply this accounting policy election consistently to similar types of transactions. An entity that makes this election would not evaluate whether shipping and handling activities are promised services to its customers. ***If revenue is recognized for the related good before the shipping and handling activities occur, the related costs of those shipping and handling activities shall be accrued.***[2]

84.     After the Relevant Period, the Company disclosed that it recorded costs for shipping and handling at the same time as it recognized revenue; however, in violation of GAAP, the Company failed to accrue the cost of these activities.

85.     Further, an investigation by the Audit Committee (the "Audit Committee Investigation") would ultimately reveal that the Company improperly capitalized as inventory $2.2

---

[2] All emphasis is added unless indicated otherwise.

million of last mile shipping expenses related to its 2023 fiscal year during the first quarter of its 2024 fiscal year. Once it discovered these unrecorded expenses, the Company then chose to capitalize them instead of amending its fiscal year 2023 financial statements, thereby misstating its financial statements for both periods.

86.     The Audit Committee Investigation further revealed errors with the Company's methodology for calculating last mile freight expenses:

> In June 2023, the Audit Committee (the "Audit Committee") of the Board of Directors of The Lovesac Company (the "Company") commenced an internal investigation related to the recording of last mile shipping expenses, resulting from the discovery of a recorded journal entry in the quarter ended April 30, 2023 to capitalize $2.2 million of shipping expenses that related to the fiscal year ended January 29, 2023. In addition to the aforementioned journal entry, the Company has identified through the investigation certain errors with the methodology used by the Company to calculate the accrual of its last mile freight expenses applicable to the Company's financial statements for the fiscal year ended January 29, 2023 and the thirteen weeks ended April 30, 2023 (the "Prior Financial Statements").[3]

***Lovesac Failed to Properly Account for Leases***

87.     Pursuant to ASC 843, at the commencement of a lease, a lessee should recognize a right-of-use ("ROU") asset and record a lease liability equal to the present value of the remaining lease payments, discounted using the rate implicit in the lease. ASC 842-20-30. The ROU asset should be amortized on a straight-line basis to the earlier of the end of its useful life or the lease term, and the lease liability is increased to account for accrued interest and decreased for lease payments made. ASC 842-20-35-3; ASC 842-20-55-29 – 30; and ASC 842-20-55-43 – 46.

88.     The FASB allows entities to recognize lease payments in net income on a straight-line basis over the lease term in lieu of recognizing the lease on its balance sheet for leases with a term not exceeding 12 months. Entities should record variable lease payments in the period in which the obligation for the payment is incurred. ASC 842-20-25-2; ASC 842-10-20.

---

[3] Lovesac August 16, 2023 Form 8-K.

89.     Lovesac adopted ASC 842 in its fiscal year 2022. Despite indications that the Company was in compliance with the practice detailed above in ¶79, Lovesac would ultimately admit, after the Relevant Period, that it failed to properly account for its operating leases beginning in 2022.

90.     The Company would further disclose that it, during its first fiscal quarter of 2024, Lovesac failed to recognize an embedded lease entered into during the quarter because the Company deemed the lease to be immaterial:

> The Company recorded adjustments to correct certain misstatements related to its operating leases. In the fiscal year 2022, the Company recorded an incorrect entry that resulted in the double-counting of rent expense associated with operating leases, with a corresponding impact on prepaid rent and lease liabilities as of January 30, 2022. In addition, the Company reversed the out of period correction of an incorrect entry pertaining to incremental borrowing rate that had been corrected for in the Annual Report on Form 10-K/A for the fiscal year ended January 29, 2023. This entry had an impact on prepaid rent, right-of-use assets, and the current and long-term portion of operating lease liabilities, as of and during the fiscal year ended January 29, 2023. The Company also recorded the effects of an embedded lease entered into during the quarter that was previously identified and considered immaterial.[4]

***Lovesac Failed to Properly Account for Revenue***

91.     Pursuant to ASC 606, an entity may not recognize revenue from a contract if no non-refundable consideration has been paid unless the following conditions are met:

a.  The parties to the contract have approved the contract (in writing, orally, or in accordance with other customary business practices) and are committed to perform their respective obligations
b.  The entity can identify each party's rights regarding the goods or services to be transferred.
c.  The entity can identify the payment terms for the goods or services to be transferred.
d.  The contract has commercial substance (that is, the risk, timing, or amount of the entity's future cash flows is expected to change as a result of the contract).
e.  It is probable that the entity will collect substantially all of the consideration to which it will be entitled in exchange for the goods or services that will be transferred to the customer.

---

[4] Lovesac Form 10-Q/A for the first fiscal quarter of 2024, page 7.

ASC 606-10-25-1.

92.     ASC 606 further mandates that an entity only recognize revenue once the entity has transferred control over promised goods or services to its customer. The following factors are to be considered when determining whether control has been transferred to the customer:

    a.  The entity has a present right to payment for the asset.
    b.  The customer has legal title to the asset.
    c.  The entity has transferred physical possession of the asset, however, physical possession may not coincide with control of an asset. For example, in a consignment arrangements, a customer or consignee may have physical possession of an asset that the entity controls. Conversely, in some bill-and-hold arrangements, the entity may have physical possession of an asset that the customer controls.
    d.  The customer has the significant risks and rewards of ownership of the asset.
    e.  The customer has accepted the asset.

ASC 606-10-25-30.

93.     As the Company would ultimately disclose after the Relevant Period, the Company violated GAAP and its own accounting policies during its fiscal year 2023 by recognizing revenues on canceled sales orders. Further, instead of amending its fiscal year 2023 financial statements when the Company discovered the improperly recognized revenues, Lovesac chose to offset the improper revenue with an increase in general and administrative expenses for its first fiscal quarter of 2024, thereby misstating its financial statements for both reporting periods.

***Lovesac Failed to Properly Account for Inventory and Cost of Goods Sold***

94.     Pursuant to GAAP, if a vendor rebate is not considered probable and cannot be reasonably estimated, it should be recorded as a reduction of the cost of goods sold at the time that the related inventory is sold.

95.     The Company would reveal after the Relevant Period that it failed to properly recognize vendor rebates that it received from certain of its suppliers during the second and third fiscal quarters of 2023. This resulted in a material understatement in the Company's cost of

merchandize sold during its second fiscal quarter of 2023 and a corresponding overstatement of cost of merchandize sold during its third fiscal quarter of 2023.

96.     The Company would further reveal that it misstated an accrual related to a duplicate recording of a vendor invoice for freight charges and failed to properly account for partial returned goods, leading to misstated inventory.

***Lovesac Failed to Properly Classify Cash Flows***

97.     Cash flows are classified as either operating, financing, or investing activities. Investing activities include "making and collecting loans and acquiring and disposing of debt or equity instruments and property, plant, and equipment and other productive assets, that is, assets held for or used in the production of goods or services by the entity." ASC 230-10-20.

98.     Financing activities include "obtaining resources from owners and providing them with a return on, and a return of, their investment; … borrowing money and repaying amounts borrowed, or otherwise settling the obligation; and obtaining and paying for other resources obtained from creditors on long-term credit." ASC 230-10-20.

99.     Operating activities refer to transactions that are not classified as investing or financing activities. ASC 230-10-20.

100.    After the Relevant Period, the Company would reveal that it failed to properly classify cash flows related to purchases of property and equipment and patents and trademarks not yet paid for at each period end.

***Materially False and Misleading Statements Issued During the Relevant Period***

101.    On June 8, 2022, the Company issued a press release announcing its financial results for the fiscal quarter ended May 1, 2022 (the "1Q23 Release"). The same day, the Company filed a quarterly report on Form 10-Q with the SEC (the "1Q23 10-Q").

102.    In the 1Q23 Release and the 1Q23 10-Q, the Company reported gross profit of

$66.1 million, operating income of $2.6 million, net income of $1.9 million, and net income per diluted share of $0.12. The Company further reported $210.2 million in total current assets, $366.6 million in total assets, $103.8 million in total current liabilities, $207.3 million in total liabilities, and $159.3 million in stockholder equity. With respect to the Company's cash flows, Lovesac reported $21.8 million in net cash used in operating activities and $6.0 million in net cash used in investing activities.

103.    These figures were materially misstated, and the Company should have reported $66.0 million in gross profit, $2.5 million in operating income, $1.8 million in net income, $0.11 in net income per diluted share, $206.2 million in total current assets, $363.6 million in total assets, $99.4 million in total current liabilities, $202.9 million in total liabilities, $160.7 million in stockholder equity, $23.3 million in net cash used in operating activities, and $4.5 million net cash used in investing activities for the period.

104.    The 1Q23 10-Q further reported that Lovesac had addressed a deficiency with the Company's information technology general controls, while failing to disclose the Company's seriously deficient internal controls over financial reporting:

> [T]he Company successfully implemented a remediation plan to address the material weakness in its internal control over financial reporting identified during our review of our audited financial statements for the fiscal year ended January 30, 2022. The material weakness was related to ineffective [information technology general] controls in the areas of user access and segregation of duties related to certain information technology systems that support our financial reporting process.

* * *

> Except as discussed above with respect to the implementation of our remediation plan, there were no changes in our internal control over financial reporting during the thirteen weeks ended May 1, 2022 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

105.    On September 8, 2022, the Company issued a press release announcing its financial results for the fiscal quarter ended July 31, 2022 (the "2Q23 Release"). The following day, the

Company filed a quarterly report on Form 10-Q with the SEC (the "2Q23 10-Q").

106.    In the 2Q23 Release and the 2Q23 10-Q, the Company reported gross profit of $80.9 million, operating income of $9.9 million, net income of $7.1 million, and net income per diluted share of $0.45. The Company further reported $209.3 million in total current assets, $373.9 million in total assets, $98.0 million in total current liabilities, $207.9 million in total liabilities, and $166 million in stockholder equity. With respect to the Company's cash flows, Lovesac reported $59.4 million in net cash used in operating activities and $13.7 million in net cash used in investing activities.

107.    These figures were materially misstated, and the Company should have reported $79.1 million in gross profit, $8.1 million in operating income, $5.8 million in net income, $0.37 in net income per diluted share, $203.6 million in total current assets, $368.9 million in total assets, $92.8 million in total current liabilities, $202.7 million in total liabilities, $166.2 million in stockholder equity, $62.9 million in net cash used in operating activities, and $10.1 million net cash used in investing activities for the period.

108.    The 2Q23 10-Q repeated substantially the same statement regarding the Company's internal controls over financial reporting that was contained in the 1Q23 10-Q. Specifically, the 2Q22 10-Q stated:

> During the thirteen weeks ended May 1, 2022, the Company successfully implemented a remediation plan to address the material weakness in its internal control over financial reporting identified during our review of our audited financial statements for the fiscal year ended January 30, 2022. The material weakness was related to ineffective [information technology general] controls in the areas of user access and segregation of duties related to certain information technology systems that support our financial reporting process.
>
>                                    * * *
>
> Except as discussed above with respect to the implementation of our remediation plan, there were no changes in our internal control over financial reporting during the thirteen weeks ended May 1, 2022 that have materially affected, or are

reasonably likely to materially affect, our internal control over financial reporting.

109.    On December 7, 2022, the Company issued a press release announcing its financial results for the fiscal quarter ended October 30, 2022 (the "3Q23 Release"). The following day, the Company filed a quarterly report on Form 10-Q with the SEC (the "3Q23 10-Q").

110.    In the 3Q23 Release and the 3Q23 10-Q, the Company reported gross profit of $63.6 million, operating losses of $11.6 million, net loss of $8.4 million, and net loss per diluted share of $0.55. The Company further reported $215.5 million in total current assets, $407.4 million in total assets, $119.0 million in total current liabilities, $249.2 million in total liabilities, and $158.2 million in stockholder equity. With respect to the Company's cash flows, Lovesac reported $65.1 million in net cash used in operating activities and $21.6 million in net cash used in investing activities.

111.    These figures were materially misstated, and the Company should have reported $64.9 million in gross profit, $10.1 million in operating losses, $7.4 million in net loss, $0.48 in net loss per diluted share, $209.2 million in total current assets, $401.0 million in total assets, $111.4 million in total current liabilities, $241.6 million in total liabilities, $159.4 million in stockholder equity, $68.4 million in net cash used in operating activities, and $18.3 million net cash used in investing activities for the period.

112.    The 3Q23 10-Q repeated substantially the same statement regarding the Company's internal controls over financial reporting that was contained in the 1Q23 10-Q and the 2Q23 10-Q. Specifically, the 3Q23 10-Q stated:

> During the thirty-nine weeks ended October 30, 2022, the Company successfully implemented a remediation plan to address the material weakness in its internal control over financial reporting identified during our review of our audited financial statements for the fiscal year ended January 30, 2022. The material weakness was related to ineffective [information technology general] controls in the areas of user access and segregation of duties related to certain information technology systems that support our financial reporting process.

* * *

Except as discussed above with respect to the implementation of our remediation plan, there were no changes in our internal control over financial reporting during the thirteen weeks ended October 30, 2022 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

113.    On March 28, 2023, the Company issued a press release announcing financial results for the fiscal quarter and year ended January 29, 2023 (the "2023 Release"). The following day, the Company filed its 2023 annual report on Form 10-K with the SEC (the "2023 10-K"). The 2023 10-K was signed by Defendants Nelson, Dellomo, Heyer, McLallen, Leite, Romig, Grafer, Krause, and Mehra.

114.    The 2023 Release reported net sales of $238.8 million, gross profit of $135.2 million, operating income of $38.1 million, net income of $27.6 million, and net income per diluted share of $1.74 for the fiscal quarter ended January 29, 2023.

115.    These figures were materially misstated, and the Company should have reported $238.5 million in net sales, $133.7 million in gross profit, $36.5 million in operating income, $26.2 million in net income, and $1.65 in net income per diluted share.

116.    Both the 2023 Release and the 2023 10-K further misstated the Company's financial results for the fiscal year ended January 29, 2023. Specifically, in the 2023 Release and the 2023 10-K, the Company reported net sales of $651.5 million, gross profit of $345.8 million, operating income of $39 million, net income of $28.2 million, and net income per diluted share of $1.77. The Company further reported $418.1 million in total assets, $224.8 million in total liabilities, and $193.3 million in stockholder equity.

117.    These figures were materially misstated, and the Company should have reported $651.2 million in net sales, $343.7 million in gross profit, $37 million in operating income, $26.5 million in net income, $1.66 in net income per diluted share, $408.6 million in total assets, $215.5

million in total liabilities, and $193.1 million in stockholder's equity.

118.    The 2023 10-K indicated that the Company's disclosure controls and internal

controls over financial reporting were effective:

> Our management, with the participation of our Chief Executive Officer (our principal executive officer) and Chief Financial Officer (principal financial officer), has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Annual Report. Our Chief Executive Officer and Chief Financial Officer have concluded, based on their evaluation, that our disclosure controls and procedures were effective as of January 29, 2023.

> \* \* \*

> Management assessed the effectiveness of the Company's internal control over financial reporting as of January 29, 2023. In making this assessment, management used the criteria set forth in 2013 by the Committee of Sponsoring Organizations of the Tread way Commission (COSO) in "Internal Control-Integrated Framework." Based on management's assessment using the COSO criteria, management has concluded that the Company's internal control over financial reporting was effective as of January 29, 2023.

119.    On April 17, 2023, Lovesac filed a proxy statement on Form DEF 14A with the

SEC (the "2023 Proxy"), soliciting shareholder approval for, *inter alia*, the re-election of

Defendants Nelson, Heyer, Grafer, Krause, Leite, McLallen, Mehra, and Romig to serve for

another one-year term on the Company's Board and the compensation of certain of the Company's

executive officers including Defendants Nelson, Krause, and Dellomo.

120.    The 2023 Proxy repeated the same misstatements regarding the Company's net

sales, gross profit, and net income for the fiscal year ended January 29, 2023 that were contained

in the 2023 Release and the 2023 10-K. Specifically, the 2023 Proxy reported $651.5 million in

net sales, $345.8 million in gross profit, and $28.2 million in net income for the year.

121.    With respect to the Company's internal controls, the 2023 Proxy stated that the

Audit Committee "reviews risks that may arise out of our internal control over financial reporting

and disclosure controls and procedures. They also review the Company's processes and procedures

with respect to risk assessment and risk management."

122.    On June 7, 2023, the Company issued a press release announcing its financial results for the fiscal quarter ended April 30, 2023 (the "1Q24 Release"). On June 9, 2023, the Company filed its quarterly report on Form 10-Q with the SEC (the "1Q24 10-Q").

123.    In the 1Q24 Release and the 1Q24 10-Q, the Company reported cost of merchandise sold of $70.5 million, gross profit of $70.7 million, total operating expenses of $76.5 million, operating losses of $5.8 million, net loss of $4.2 million, and net loss per diluted share of $0.28. The Company further reported $187.7 million in total current assets, $428.1 million in total assets, $238.8 million in total liabilities, and $189.3 million in stockholder equity.

124.    These figures were materially misstated, and the Company should have reported $70.6 million in cost of merchandise sold, $70.6 million in gross profit, $76.3 million in total operating expenses, $5.7 million in operating losses, $4.1 million in net loss, $0.27 in net loss per diluted share, $181.5 million in total current assets, $421.3 million in total assets, $232 million in total liabilities, and $189.2 million in stockholder equity.

125.    The 1Q24 10-Q stated the following with respect to the Company's internal controls over financial reporting without disclosing the rampant issues with the Company's finance function: "There were no changes in our internal control over financial reporting during the thirteen weeks ended April 30, 2023 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

***The Truth Emerges***

126.    On August 16, 2023, the Company filed a current report on Form 8-K (the "August 16, 2023 8-K"), which disclosed that investors should no longer rely on previously issued financial statements contained in the 2023 10-K and the 1Q24 10-Q. The filing further disclosed the commencement of the Audit Committee Investigation. Specifically, the August 16, 2023 8-K

stated:

In June 2023, the Audit Committee (the "Audit Committee") of the Board of Directors of The Lovesac Company (the "Company") commenced an internal investigation related to the recording of last mile shipping expenses, resulting from the discovery of a recorded journal entry in the quarter ended April 30, 2023 to capitalize $2.2 million of shipping expenses that related to the fiscal year ended January 29, 2023. In addition to the aforementioned journal entry, the Company has identified through the investigation certain errors with the methodology used by the Company to calculate the accrual of its last mile freight expenses applicable to the Company's financial statements for the fiscal year ended January 29, 2023 and the thirteen weeks ended April 30, 2023 (the "Prior Financial Statements").

In particular, as a result of the identified errors related to last mile freight expenses, the Company believes that previously reported operating income and net income were overstated by approximately $1.5 million to $2.5 million and $1.0 million to $2.0 million, respectively, for fiscal year 2023. When aggregating this error with other estimated required correcting entries the Company believes that operating income and net income were overstated by approximately $2.0 million to $3.0 million and $1.5 million to $2.5 million, respectively, for the fiscal year ended January 29, 2023. Additionally, the Company believes that the identified errors related to the accrual methodology, together with the incorrectly recorded entry related to last mile freight expenses resulted in the overstatement of previously reported operating income and net income of less than $0.5 million, respectively, for the thirteen weeks ended April 30, 2023. When aggregating these errors with other estimated required correcting entries the Company believes that operating income and net income were overstated by less than $0.5 million, respectively, for the thirteen weeks ended April 30, 2023.

On August 15, 2023, the Company, in consultation with the Audit Committee of its Board of Directors and outside advisors, reached a determination that the Company's financial statements for fiscal year 2023 included in the Company's Annual Report on Form 10-K for the fiscal year ended January 29, 2023, management's report on internal control over financial reporting for the fiscal year ended January 29, 2023, the associated audit report and report on internal control over financial reporting of the Company's independent registered public accounting firm, Deloitte & Touche LLP ("Deloitte"), and the Company's condensed financial statements included in the Company's Quarterly Report on Form 10-Q for the thirteen weeks ended April 30, 2023, should no longer be relied upon.

Accordingly, the Audit Committee, in consultation with the Company's management, has determined that the Prior Financial Statements will be restated. In addition, any previously issued or filed earnings releases, investor presentations or other communications describing the Prior Financial Statements and other related financial information covering these periods should no longer be relied upon. We are working diligently to complete the restatements and expect to file a Form 10-

K/A that will include restated financial statements for the 2023 fiscal year end and the interim periods contained therein, as necessary, as well as a Form 10-Q/A that will include restated financial statements for the thirteen weeks ended April 30, 2023 (the "Restatements") promptly after completion of our analysis. Although the Audit Committee's internal investigation described above is substantially complete, there can be no assurance that the ongoing review will not result in further adjustments to the Company's financial statements.

127.    On this news, the price of Lovesac stock declined 2.95%, closing at a $23.06 per share on August 17, 2023.

128.    On November 2, 2023, the Company filed the Restatement, which revealed that the Audit Committee Investigation "concluded $2.2 million of last mile shipping expenses relating to the fiscal year ended January 29, 2023 were improperly capitalized during the quarter ended April 30, 2023." The Restatement further disclosed that "the methodology used to estimate an accrual of last mile freight expenses at each period end was not accurate because the calculation did not use the correct number of shipments that were accepted by the shipper for delivery, but not yet invoiced to the Company."

129.    The Restatement explained that the Company was forced to restate its financial statements in the following ways:

(a) Last Mile Freight

The Company recorded adjustments to correct misstatements identified in the internal investigation related to last mile freight expenses. The correction of this item represents the net impact of the findings from the investigation as noted above.

(b) Leases

The Company recorded adjustments to correct certain misstatements related to its operating leases. In the fiscal year 2022, the Company recorded an incorrect entry that resulted in the double-counting of rent expense associated with operating leases, with a corresponding impact on prepaid rent and lease liabilities as of January 30, 2022. In addition, the Company recorded an incorrect entry pertaining to incremental borrowing rate that resulted in misstatements associated with operating leases, with a corresponding impact on prepaid rent, right-of-use assets, and the current and long-term portion of operating lease liabilities, as of and during the fiscal year ended January 29, 2023

(c) Buyer's Remorse

The Company recorded an adjustment to correct certain canceled sales orders related to buyer's remorse, which resulted in an overstatement of net revenue and trade receivables as of and for the fiscal year ended January 29, 2023. The Company defines buyer's remorse as a customer who cancels an order within a short window of time after making a purchase.

(d) Supplier Rebates

During the quarter ended July 31, 2022, the Company received rebates from certain of its suppliers which was incorrectly recorded to cost of goods sold for the entire amount of the rebate received instead of deferring a portion of the rebate to inventory and recognizing the rebate in cost of goods sold as the related inventory was sold. We corrected these misstatements to defer the up-front consideration from suppliers when the retention or receipt of that consideration was to recognize the consideration as a reduction of cost of goods sold over the sell through rate of the inventory.

(e) Balance Sheet Reclassifications

The Company recorded adjustments to correct the classification of certain balance sheet reclassifications between short and long-term assets. These adjustments primarily related to the classification of prepaid expenses and other current assets and the classification of other assets (long-term). In addition, the Company recorded adjustments to correct the classification of tenant improvement allowances which resulted in a reclassification between prepaid expenses and other current assets and short-term lease liabilities.

(f) Income Taxes

The Company recorded adjustments to recognize the net impact on current and deferred income taxes associated with all the misstatements described herein. The adjustments to income taxes were recorded in the period corresponding with the respective misstatements. The correction of these misstatements resulted in a decrease in provision for income taxes of $0.3 million and a decrease in benefit from income taxes of $0.5 million, respectively for the years ended January 29, 2023 and January 30, 2022.

(g) Inventory and Cost of Goods Sold

The Company recorded adjustments to correct for a misstatement of an accrual related to a duplicate recording of a vendor invoice for freight charges. The Company recorded another adjustment to correct for the misstatement of inventory related to partial returned goods.

(h) Cash Flow Reclassification

The Company corrected the cash flow presentation related to purchases of property and equipment and patents and trademarks not yet paid for at period end. This resulted in a reclassification between cash flows from operating activities and investing activities for the fiscal year ended January 30, 2022 and for the fiscal periods ended October 30, 2022, July 31, 2022 and May 1, 2022. There was no impact to net change in cash and cash equivalents.

130.    The Restatement further revealed material deficiencies in the Company's internal controls over financial reporting. The deficiencies related to: "1) journal entries operated by competent personnel to identify and correct, in a timely manner, erroneous manual journal entries, and 2) the shipping accrual process," and they were caused by:

[A]n ineffective control environment resulting from a lack of a sufficient number of professionals with an appropriate level of accounting knowledge, training and experience to appropriately analyze, record and disclose accounting matters timely and accurately and to consistently establish appropriate authorities and responsibilities in pursuit of the Company's financial reporting objectives. The Company also did not maintain appropriate oversight and monitoring activities and responsibilities in pursuit of its financial reporting objectives and did not sufficiently promote, monitor or enforce appropriate accounting policies and procedures.

131.    The Restatement further acknowledged that high turnover in the Company's accounting department contributed to its materially deficient internal controls over financial reporting.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

132.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

133.    Lovesac is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

134.    Plaintiff is a current shareholder of Lovesac and was a continuous shareholder of

the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

135.   At the time this action was commenced, the eight-member Board was comprised of Defendants Nelson, Heyer, Krause, Grafer, Leite, Mehra, McLallen, and Romig. Accordingly, Plaintiff is only required to show that four Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Board's current directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

136.   The Individual Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Individual Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Individual Defendants could not fairly and fully prosecute such a suit even if they instituted it.

137.   The Individual Defendants either knowingly or recklessly issued or caused the Company to issue the materially false and misleading statements alleged herein. The Individual Defendants knew of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Individual Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

138.    As members of the Board charged with overseeing the Company's affairs, each of the Individual Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Lovesac, the Individual Defendants knew, or should have known, the material facts surrounding the material deficiencies in the Company's internal controls over financial reporting.

139.    Defendant Nelson is not disinterested or independent, and therefore, is incapable of considering a demand because he is named as a defendant, and faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

140.    Defendants Leite, Mehra, McLallen, and Romig either serve, or served during the Relevant Period, as members of the Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, public disclosure requirements and internal controls over financial reporting. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the adequacy of the Company's internal controls over financial reporting as alleged above. Therefore, Defendants Leite, Mehra, McLallen, and Romig cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

141.    Furthermore, demand in this case is excused because each of the directors derive substantial revenue from the Company, control the company, and are indebted to each other. These conflicts of interest have precluded the current directors from calling into question the other

Individual Defendants' conduct or taking any remedial actions to redress the conduct alleged herein. For instance, none of the Individual Defendants have sought to enforce Lovesac's Clawback Policy which provides for:

> [T]he recovery of or forfeiture to the Company of any excess incentive compensation received from our [executive officers] if (a) the Company is required to restate any financial results due to the material noncompliance of the Company with any financial reporting requirements under the securities laws, and (b) the Audit Committee determines that the NEOs engaged in misconduct (including, but not limited to an act of fraud or breach of fiduciary duty) that resulted in the material noncompliance.

142.    The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds *i.e.*, monies belonging to the stockholders of Lovesac. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or certain officers of Lovesac, there would be no directors' and officers' insurance protection. Accordingly, the Individual Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

143.    If there is no directors' and officers' liability insurance, then the Individual Defendants will not cause Lovesac to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

144.     Accordingly, for all of the reasons set forth above, all of the current directors cannot consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

**COUNT I**
**Against the Individual Defendants for**
**Breach of Fiduciary Duties**

145.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

146.     The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

147.     The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

148.     The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties by failing to ensure that the Company maintained adequate internal controls over financial reporting and complied with all relevant accounting standards, including GAAP. As alleged above, the Individual Defendants ignored red flags concerning the unusually high rate of turnover in Lovesac's various financial departments, including accounts payable, which adversely impacted the Company's ability to monitor, record, and pay its accounts payable. In addition, the Individual Defendants ignored the consistently low internal employee ratings for the finance department in employee engagement surveys.

149.     As a consequence of Lovesac's grossly deficient internal controls over financial reporting, the Company was required to restate its financial results for the fiscal year ended January 29, 2023 and the fiscal quarter ended April 30, 2023.

150.     The Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

151.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

152.     Plaintiff, on behalf of Lovesac, has no adequate remedy at law.

### COUNT II
**Against the Individual Defendants**
**For Aiding and Abetting Breach of Fiduciary Duty**

153.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

154.     By encouraging and accomplishing the illegal and improper actions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties,

waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

155.    Plaintiff, on behalf of Lovesac, has no adequate remedy at law.

### COUNT III
### Against the Individual Defendants for
### Unjust Enrichment

156.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

157.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Lovesac.

158.    The Individual Defendants were unjustly enriched by their receipt of bonuses, stock options, or similar compensation from Lovesac that was tied to their performance or to the artificially inflated valuation of Lovesac.

159.    Plaintiff, as a stockholder and representative of the Company, seeks restitution from the Individual Defendants, and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants as a result of their wrongful conduct and fiduciary breaches.

160.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

161.    Plaintiff, on behalf of Lovesac, has no adequate remedy at law.

### COUNT IV
### Against the Individual Defendants for Violations of § 14(a)
### of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)

162.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

163.    The Individual Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. §

78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

164.    The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2023 Proxy filed with the SEC. As alleged above, this filing contained materially false and misleading statements concerning the Company's financial results and its internal controls over financial reporting.

165.    The 2023 Proxy was used to solicit shareholder votes in connection with the election of Defendants Nelson, Heyer, Grafer, Krause, Leite, McLallen, Mehra, and Romig to serve for another one-year term on the Company's Board and the compensation of certain of the Company's executive officers including Defendants Nelson, Krause, and Dellomo.

166.    Describing the Company's compensation policy, the 2023 Proxy indicated that the compensation is performance-based, stating that "[i]t is based on a pay for performance philosophy that rewards executives for achieving financial, operational and other goals."

167.    The materially false and misleading statements contained in the 2023 Proxy regarding the Company's financial results and the adequacy of its internal controls over financial reporting therefore misleadingly induced shareholders to vote in favor of the election of Defendants Nelson, Heyer, Grafer, Krause, Leite, McLallen, Mehra, and Romig and performance-based compensation to Defendants Nelson, Krause, and Dellomo, to which they were not entitled.

168.    The payment of unwarranted performance-based compensation to these Company executives was a waste of corporate assets.

### COUNT V
### Against the Individual Defendants for
### Waste of Corporate Assets

169.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

170.    The Individual Defendants breached their fiduciary duties by failing to properly

supervise and monitor the adequacy of Lovesac's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

171.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things, incurring and paying defense costs in connection with the Securities Action, and approving performance-based compensation linked to the Company's perceived successes.

172.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

173.    Plaintiff on behalf Lovesac has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.      Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.      Awarding punitive damages;

D.      Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: July 19, 2024                     **LACHTMAN COHEN & BELOWICH LLP**

                                          */s/ Brian S. Cohen*
                                          Brian S. Cohen
                                          500 West Putnam Avenue, Suite 400
                                          Greenwich, CT 06830
                                          Tel: (203) 404-4960
                                          Email: bcohen@lcb-law.com

                                          **RIGRODSKY LAW, P.A.**
                                          Seth D. Rigrodsky
                                          Timothy J. Macfall
                                          Samir Aougab
                                          825 East Gate Boulevard, Suite 300
                                          Garden City, NY 11530
                                          Telephone: (516) 683-3516
                                          Email: sdr@rl-legal.com
                                          Email: tjm@rl-legal.com
                                          Email: sa@rl-legal.com

                                          **GRABAR LAW OFFICES**
                                          Joshua H. Grabar
                                          1650 Market Street, Suite 3600
                                          Philadelphia, PA 19103
                                          Tel:  267-507-6085
                                          Email: jgrabar@grabarlaw.com

                                          *Attorneys for Plaintiff*

## <u>VERIFICATION OF JESSICA GETZ</u>

I, Jessica Getz, am a plaintiff in this action.  I have reviewed the allegations made in the Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. As to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 7/19/2024
_____

_____
Jessica Getz